UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

BRENDA TAYLOR,                      )
                    Plaintiff,      )
                                    )        No. 1:04-CV-301
v.                                  )
                                    )        COLLIER/LEE
JO ANNE B. BARNHART,                )
  Commissioner of Social Security,  )
                    Defendant.      )

REPORT AND RECOMMENDATION

This action was instituted pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final decision of the Commissioner of Social Security denying the plaintiff a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act. This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b) and Rule 72(b) of the Federal Rules of Civil Procedure for a report and recommendation regarding the disposition of Plaintiff's motion for judgment on the pleadings (Court File No. 13) and Defendant's motion for summary judgment (Court File No. 16).

For the reasons stated herein, I **RECOMMEND** that the decision of the Commissioner be **REVERSED** and **REMANDED** under Sentence Four of 42 U.S.C. § 405(g) for further proceedings consistent with this Report and Recommendation.

Administrative Proceedings

Plaintiff applied for DIB in January 2002 alleging a disability onset date of May 28, 2001 (Tr. 227-29). After a hearing, the Administrative Law Judge ("ALJ") issued a fully favorable decision dated February 28, 2003 (Tr. 49-58). The Appeals Council reviewed the ALJ's decision on its own motion, vacated the decision, and remanded the case for further administrative proceedings (Tr. 59-66). Additional evidence was obtained and a supplemental hearing was held

on March 2, 2004 (Tr. 420-41). On April 15, 2004, the ALJ found that Plaintiff was not disabled because she retained the RFC to perform work that existed in significant numbers in the national economy (Tr. 20-24). The Appeals Council denied Plaintiff's request for review of the ALJ's decision, thus, leaving that decision as the final decision of the Commissioner subject to judicial review (Tr. 7-9).

### Standard of Review

The Court must determine whether the ALJ failed to apply the correct legal standard and whether the ALJ's findings of fact were supported by substantial evidence. 42 U.S.C. § 405(g); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997)). If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the Court might have decided facts differently, or if substantial evidence also would have supported other findings. *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The Court may not re-weigh the evidence and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard allows considerable latitude to administrative decision makers because it presupposes there is a zone of choice within which the decision makers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citing *Mullen v. Bowen*, 800 F.2d 535, 548 (6th Cir. 1986)); *Crisp v. Sec'y of Health & Human Servs.*, 790 F.2d 450, 453 n.4 (6th Cir.

1986).  The Court may consider any evidence in the record, regardless of whether it has been cited by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The United States Court of Appeals for the Sixth Circuit ("Sixth Circuit") has held that substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion."  *Garner*, 745 F.2d at 388 (citation omitted).

## How Disability Benefits Are Determined

Disability is defined as the inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  The Commissioner's regulations provide that disability claims are evaluated by way of a five-step sequential analysis.  20 C.F.R. § 404.1520.  The five-step analysis is sequential because if, at any step, the claimant is found to be not disabled or to be disabled, then the claim is reviewed no further.  20 C.F.R. § 404.1520(a).  The following are the five steps in the analysis:

Step 1:  Is claimant engaged in substantial gainful activity?  If so, claimant is not disabled.  20 C.F.R. § 404.1520(b).

Step 2:  Does claimant have a "severe" impairment or combination of impairments that significantly limits claimant's ability to do basic work activities, and will foreseeably result in death or last at least twelve months?  If not, claimant is not disabled.  20 C.F.R. §§ 404.1509, 404.1520(c), 404.1521.

Step 3:  Does the claimant's impairment meet or equal the criteria of an impairment described in the Listing of Impairments, 20 C.F.R. Pt. 404, Subpt. P, Appendix 1?  If so, the claimant  is disabled, and the analysis may end without inquiry into the vocational factors.  20

C.F.R. § 404.1520(d). If inquiry is made into vocational factors, after step three but before step four, the Commissioner evaluates a claimant's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e)-(f); 404.1545.

Step 4: Does claimant's RFC permit claimant to perform claimant's past relevant work? If so, the claimant is not disabled. 20 C.F.R. § 404.1520(f).

Step 5: Does the claimant retain the RFC to perform other work in the economy? If so, the claimant is not disabled. 20 C.F.R. § 404.1520(g).

The burden of proof is upon the claimant at steps one through four to show disability. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391-92 (6th Cir. 1999). Once the claimant has demonstrated the extent of claimant's RFC at step four, the burden shifts to the Commissioner to show that there is work in the national economy that may accommodate claimant's RFC. *Id.*

## ALJ's Findings

The ALJ concluded at step five of the sequential analysis that Plaintiff was not disabled because she could perform work existing in significant numbers in the national economy (Tr. 20-24). The ALJ made the following findings in support of the decision, which are conclusive if they are supported by substantial evidence in the record:

1.  The claimant meets the disability insured status requirements of the Act.

2.  The claimant has not engaged in substantial gainful activity since May 28, 2001.

3.  The claimant has "severe" impairments, as described in the decision, but does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4

4.      The claimant's subjective complaints are not fully credible.

5.      The claimant has the residual functional capacity to perform work activity, as follows: she would not be able to work above chest level; she could operate foot controls, but due to her right knee injury would not be able to engage in heavy foot controls and would have some degree of difficulty in continuous use of the right foot; she would be precluded from bending and squatting on a frequent basis, but could do so occasionally; she would be limited in her ability to climb ladders, and could use stairs on an occasional basis only; she would not be able to twist her right knee or work on uneven surfaces; and she would be required to avoid environmental irritants.

6.      The claimant is unable to perform any past relevant work and has no transferable work skills.

7.      The claimant is 43 years old, which is defined as a younger individual.

8.      The claimant has a 12th grade education.

9.      Based on an exertional capacity for light or, alternatively, sedentary work and the claimant's age, education, and work experience, 20 CFR § 404.1569 and Rule 202.21 and Rule 201.28, Appendix 2, Subpart P, Regulations No. 4 direct a conclusion of "not disabled."

10.     Although the claimant's additional nonexertional limitations do not allow her to perform the full range of either light or sedentary work, using the above-cited rules as a framework for decisionmaking, a significant number of jobs in the national, state, and regional economies exist which the claimant could perform.  Representative examples and numbers of such jobs were identified by an impartial vocational expert at the supplemental hearing.

11.     The claimant has not been under a "disability," as defined in the Social Security Act, at any time through the date of this decision.

(Tr. 23-24).

<u>Issues for Review</u>

Plaintiff contends the ALJ erred at step five of the disability analysis when he found the

Plaintiff had the RFC to perform light and sedentary work activity because:  1) expert testimony

5

demonstrates Plaintiff's inability to pursue substantial gainful activity; 2) the ALJ erred by failing to properly consider the opinion of Dr. Johnson, one of Plaintiff's treating physicians; and 3) the ALJ erred in reconsidering his initial finding that Plaintiff was a credible witness and thus improperly discounted her subjective complaints of pain.

<u>Review of Evidence</u>

*Plaintiff's Age, Education, and Past Work Experience*

Plaintiff was forty-three years old and had a high school education when the ALJ denied her claim (Tr. 23-24, 227, 244). She had work experience as a chemical plant operator and spray painter at a stove plant (Tr. 259-62).

*Evidence Pertaining to Disability*

In April 2001, Plaintiff began treatment with Sigrid R. Johnson, M.D. as a result of a urinary tract infection and lower abdominal pain (Tr. 378). To investigate the possibility of kidney stones, Dr. Johnson ordered a renal ultrasound, and the test was normal (Tr. 377-78). Within a week, Plaintiff reported that her abdominal pain was "much better" (Tr. 377).

In June 2001, Plaintiff saw J. Patterson Stone, M.D., at the request of Dr. Snoddy, a physician at Plaintiff's place of employment, for a left arm injury after a fall (Tr. 338-39). Left shoulder and left elbow x-rays revealed some mild degenerative changes and wires that had been placed in her elbow after an injury when she was a child (Tr. 338-39). Dr. Stone felt that Plaintiff had multiple contusions and diffused shoulder and elbow pain/inflammation but no evidence of fracture or other potential soft tissue injuries (Tr. 339). He recommended medication and range of motion exercises (Tr. 339). In July 2001, Dr. Stone recommended Tylenol and increased activities "as tolerated," including returning to work (Tr. 337). In a telephone conversation between Dr.

6

Snoddy and Dr. Stone, Dr. Snoddy recommended physical therapy and Dr. Stone agreed, but stated he understood that Dr. Snoody "was not comfortable with her functional ability of being able to return to any jobs they [Plaintiff's last employer] had available" (Tr. 336). During July and August 2001, Plaintiff underwent left arm physical therapy (Tr. 301-09). The physical therapist noted that Plaintiff was "extremely hypersensitive" to touch and with range of motion testing (Tr. 308). At the completion of the physical therapy, Plaintiff felt that her treatment had actually made her pain worse (Tr. 302). The physical therapist, however, noted some improvements with range of motion (Tr. 302).

In August 2001, Plaintiff returned to Dr. Stone's office and saw Robert A. Beasley, M.D., with complaints of a right knee injury sustained in a fall while dancing (Tr. 335). She came to the office with a knee immobilizer and crutch apparently issued to her after a visit to Erlanger Hospital (Tr. 335). Right knee x-rays revealed no acute findings and Dr. Beasley recommended that she stop using the crutch but continue wearing the immobilizer except when exercising (Tr. 335). In September 2001, Plaintiff underwent a right knee MRI scan which revealed some tears (Tr. 333). Dr. Stone recommended arthroscopy with a possible repair during the operation (Tr. 332). After arthroscopy, Dr. Stone ordered physical therapy and opined that Plaintiff needed to avoid twisting, climbing, and carrying (Tr. 331). In October 2001, Dr. Stone noted that Plaintiff needed to continue with physical therapy and gave her a note for "limited duty with 6 hours of standing, walking" (Tr. 330). He opined that sedentary work would "be quite doable for her" (Tr. 330).

In September 2001, Plaintiff returned to Dr. Johnson with complaints of left shoulder pain and he noted pain, tenderness, and decreased range of shoulder motion (Tr. 377). In October 2001, Plaintiff underwent several tests (Tr. 310-12, 314-17). A nerve conduction study revealed no

evidence of left carpal tunnel syndrome but there was a slight decrease in the ulner nerve suggesting neuropathy across the elbow (Tr. 311). A left shoulder MRI scan revealed a partial rotary cuff tear (Tr. 314-15). A renal ultrasound was normal (Tr. 316-17).

In November 2001, Plaintiff saw George R. Baddour, Jr., M.D., at the request of Dr. Johnson (Tr. 318-26). On examination, Plaintiff had no muscular atrophy and she had intact sensation and motor function in both arms (Tr. 324-25). There were no degenerative joint changes noted on x-ray, but Dr. Baddour noted the MRI scan revealed a partial thickness rotator cuff tear (Tr. 326). Dr. Baddour explained to Dr. Johnson that Plaintiff was "quite demonstrative" in describing her pain which he felt was "a much greater degree" than he expected with the typical patient with a partial rotator cuff tear (Tr. 321). Dr. Baddour injected Plaintiff's shoulder hoping that the steroid injection would help relieve her pain and make it easier to examine her (Tr. 326). Two weeks later, Plaintiff reported that the injection helped for only three days (Tr. 326). Dr. Baddour noted that Plaintiff's symptoms were more pronounced than he expected and that she was probably not an ideal candidate for surgery, and he recommended medication and physical therapy (Tr. 320).

In November 2001, Plaintiff returned to Dr. Stone and reported that she had another fall (Tr. 329). Right knee x-rays revealed no fractures and, on examination, her knee was tender (Tr. 329). Dr. Stone recommended increased activity and physical therapy (Tr. 329). In December 2001, Dr. Stone opined that Plaintiff could return to work with avoidance of ladders, open scaffolds, and no twisting or squatting (Tr. 328). He noted that it might be necessary for her to do some intermittent work in a seated position until her knee was completely pain-free, but that she was ready to return to work (Tr. 328).

In February 2002, Plaintiff returned to Dr. Johnson and reported that she could not move her

left arm over her head and continued to have left shoulder pain (Tr. 137, 374-75). On examination, her shoulder was tender and she had poor range of motion (Tr. 374). Plaintiff refused a shoulder joint injection and "appeared disgusted" with her medical treatment (Tr. 137, 375). Dr. Johnson offered medications and anti-depressants (Tr. 137, 375).

In March 2002, Plaintiff saw David J. Caye, M.S., at the request of the state agency (Tr. 340-44). Plaintiff reported that she was depressed with little interest in activities and that she spent most of her time sitting and crying (Tr. 340). Plaintiff told Mr. Caye that while she had never been hospitalized for emotional instability, she had been taking Prozac "for some time now," an amount of time Plaintiff estimated to be approximately ten years (Tr. 341). At the same time, Plaintiff related doing household chores, talking to her parents, sister, and friends daily, visiting with a friend every few weeks, visiting with her brother, and visiting with other friends perhaps once or twice throughout the week (Tr. 342). She had a best friend and, occasionally, spent several days with her during which they walked through the malls, conversed, and went to various events such as boat shows and looking at cars (Tr. 342). Plaintiff reported that she drank to the point of intoxication each weekend (Tr. 341). Mr. Caye reported that the mental status examination showed intact concentration, recall, and persistence (Tr. 343). Although she appeared mildly depressed, her cognitive abilities appeared intact (Tr. 343). Mr. Caye's impression was major depressive disorder, recurrent, mild-to- moderate and alcohol abuse (Tr. 343). He opined that Plaintiff had an intact ability to understand and remember with minimal restriction in her ability to concentrate (Tr. 343). He felt that her persistence on task may be mildly adversely affected by motivation related to depression, but her social interactive patterns were adequate and her problem-solving skills were intact (Tr. 344). In April 2002, a state agency psychiatrist (name illegible, but a Ph.D.) reviewed

Plaintiff's records for the state agency and opined that she did not have a severe mental impairment (Tr. 349-63).

In April 2002, Plaintiff was examined by William A. Holland, Jr., M.D., at the request of the state agency (Tr. 345-48). Plaintiff explained that she had "almost no function" with her left arm (Tr. 345). On examination, Plaintiff had normal range of right arm motion with full grip strength (Tr. 347). She demonstrated very little left arm range of motion but Dr. Holland noted that she did not appear to be exerting her maximum effort (Tr. 347). He saw no evidence of joint edema, erythema, or increased warmth in the left upper extremity (Tr. 347). Dr. Holland also noted that Plaintiff's x-ray studies were negative with no joint pathology, except for a partial thickness tear of her surpraspinatus muscle (Tr. 347). Dr. Holland opined that there was no reason Plaintiff could not work with a combination of sitting, standing, and walking (Tr. 348). Even with her left arm in a sling, Dr. Holland felt that Plaintiff could lift, push, or pull five-to-ten pounds on a regular basis and up to twenty pounds occasionally (Tr. 348).

In May 2002, James N. Moore, M.D., reviewed Plaintiff's records for the state agency and opined that she retained the ability to perform work at the light exertional level but was limited in her ability to push/pull with her left upper extremity and right lower extremity (Tr. 365). Dr. Moore opined that Plaintiff could never climb ladders, ropes, or scaffolds but could occasionally kneel, crouch, and crawl and was limited in her ability to reach with her left arm (Tr. 366-67).

In April 2002, Plaintiff returned to Dr. Johnson with complaints of a sore throat and cough (Tr. 136, 374). Dr. Johnson assessed bronchitis and treated her with Tylenol, fluids, and rest (Tr. 374). In May 2002, Plaintiff complained of lung problems and the doctor noted that Plaintiff smoked a pack of cigarettes a day (Tr. 373). The doctor assessed bronchitis and prescribed an

inhaler (Tr. 373). In June 2002, Plaintiff underwent a pulmonary function study (Tr. 138-40, 152-53). Dr. Johnson diagnosed chronic obstructive pulmonary disease (COPD) (Tr. 136, 138-40, 373).

In June 2002, Plaintiff began treatment with Duc Nguyen, M.D., for right knee pain (Tr. 110-31). In July 2002, Plaintiff underwent a right knee arthroscopy and ligament reconstruction (Tr. 88-108, 129-30). Dr. Nguyen reported that there was "excellent bone purchase" and Plaintiff's knee had full range of motion and full clearance with "great tension" (Tr. 89). By the end of July 2002, Plaintiff reported that her knee was "feeling pretty good" and her physical therapist noted that she was "doing well" (Tr. 121-22). Dr. Nguyen reported that Plaintiff had a good range of motion and gait and that she needed to continue her physical therapy (Tr. 120).

In July 2002, Morse Kochitzky, M.D., reviewed Plaintiff's records for the state agency (Tr. 380-87). He opined that Plaintiff retained the ability to work at the light exertional level with difficulties pushing and pulling with her left upper extremity and right lower extremity (Tr. 381). He also opined that she should never climb ladders, ropes, or scaffolds, and could occasionally kneel, crouch, and crawl (Tr. 382) and while she could use her left arm occasionally, she could not reach overhead (Tr. 383).

In August 2002, Dr. Nguyen reported that Plaintiff continued to do well after her knee surgery (Tr. 113). He found she had good range of motion, solid stability, was neurologically intact and needed to continue her physical therapy (Tr. 113). By September 2002, the physical therapist noted that Plaintiff had progressed very well with range of motion, strength, and endurance (Tr. 111).

Also in September 2002, Plaintiff returned to Dr. Johnson with complaints of shortness of breath (Tr. 135). In October 2002, Plaintiff also complained to Dr. Johnson of right hip and back

11

pain "for some time" but Dr. Johnson noted that "she has never complained to me about this before" (Tr. 134). On examination, she had good back flexion and extension with normal range of motion and negative straight leg raising (Tr. 134). Plaintiff continued to complain of shortness of breath and cough during December 2002 (Tr. 133-34). In February 2003, Dr. Johnson assessed sinusitis and prescribed Tylenol, fluids, rest, and an inhaler (Tr. 133). An April 2003 chest x-ray was normal (Tr. 151). In May 2003, Plaintiff spent three days in the hospital for treatment of her shortness of breath (Tr. 149-50, 162-64). An echocardiogram was essentially normal (Tr. 176-79). A chest x-ray was normal, showing her lungs to be clear (Tr. 183). A CT scan revealed no evidence of pulmonary embolus and Plaintiff's lungs were essentially clear (Tr. 181). A ventilation perfusion lung scan was suggestive of "mild" COPD (Tr. 180). Still, Dr. Johnson noted that Plaintiff had "terrible lungs for a young woman of her age" (Tr. 150). By February 2003, Dr. Johnson had prescribed breathing treatments every four hours (Tr. 133).

On June 26, 2003, Ronald R. Cherry, M.D., examined Plaintiff and opined that she had apparently severe COPD based on complaints of chronic cough, chest congestion, and shortness of breath on exertion (Tr. 166). Bilateral lower extremity ultrasounds taken in May 2003 showed no evidence of deep venous thrombosis (Tr. 182). In June 2003, Dr. Johnson noted that Plaintiff had coarse breath sounds and again recommended that she stop smoking (Tr. 144).

In September 2003, Plaintiff reported that she had decreased her smoking from three packs a day to one pack a day (Tr. 142). On September 25, 2003, in a form questionnaire, Dr. Johnson noted that Plaintiff could not work based on her chronic respiratory disease (Tr. 154-57). In October 2003, Dr. Johnson noted that Plaintiff was doing "fairly well" but was "still coughing and still smoking" (Tr. 194). In November 2003, Plaintiff complained to Dr. Johnson of burning and pain

from her right hip to her foot; however, in another visit two days later, Dr. Johnson found her lungs were "markedly clearer" (Tr. 193).

In October 2003, Plaintiff returned to Dr. Cherry with complaints of chronic cough and chest congestion (Tr. 203). Dr. Cherry noted mild expiratory wheezes bilaterally (Tr. 203). In December 2003, Dr. Cherry opined that Plaintiff could work as long as she was not exposed to chemical fumes, dust, or smoke, and that she could perform only "sedentary work" such as sitting, standing, or walking less than one-half block (Tr. 189).

*Hearing Testimony*

There were two hearings in this case. The first hearing was held on February 20, 2003 (Tr. 408-19) and a supplemental hearing was held on March 2, 2004 (Tr. 420-41). At the first hearing in 2003, exhibits were reviewed along with Plaintiff's list of impairments (Tr. 410-418). Plaintiff did not testify, and, at the end of the hearing, the ALJ noted that he was going to grant benefits in her case (Tr. 418).

At the second hearing, Plaintiff testified that she had constant left arm pain that resulted in tingling in her fingers, but she had no problems with her right hand (Tr. 437-38). She had left knee pain that traveled into her hip (Tr. 438). She could not squat and kept her leg propped up because of the swelling (Tr. 438). She could not stand for "a very long time at all" and could not do "a lot of walking" (Tr. 438). Plaintiff testified that she used a breathing machine anywhere from four to eight times a day (Tr. 439). The ALJ questioned Plaintiff about her efforts to reduce or stop smoking and lose weight (Tr. 439-40).

Edward Griffin, M.D. testified as a medical expert (Tr. 423-29). The doctor reviewed Plaintiff's medical file (Tr. 423-24). He explained that the record supported some degree of pain

13

to a mild-to-moderate degree in the right knee but not for shoulder pain (Tr. 427). He testified that while Plaintiff reported that her shoulder hurt when she gripped with her hand, that claim was not plausible because gripping did not use the muscles pulling across her shoulder (Tr. 428, referring to Tr. 345-48). He opined that Plaintiff should not lift above her head repeatedly but that there was no limit for pushing and pulling, or in the ability to grasp or manipulate objects (Tr. 425). He also testified that Plaintiff should not use heavy pedal foot controls, she could squat occasionally and occasionally negotiate stairs, she should not perform work that required a lot of twisting or turning with the right knee, she should not work on an uneven surface, and she should avoid environmental irritants (Tr. 425-26). At the hearing, the ALJ mentioned that Plaintiff's breathing capacity would require her to avoid environmental irritants in his examination of Dr. Griffin, the medical expert (Tr. 432).

Ben Johnston testified as an impartial vocational expert (Tr. 430-36). The ALJ posed a hypothetical question, asking the vocational expert to consider an individual of Plaintiff's age, education, and work history, who could not work above chest level, who could operate foot controls but no heavy foot controls on the right, who had some difficulty in continuous use of the right foot, who was precluded from bending and squatting on a frequent basis, and who was limited in her ability to climb ladders and could use stairs only on an occasional basis, who could not twist her right knee or move on uneven surfaces, and who needed to avoid environmental irritants (Tr. 431-32). The vocational expert identified unskilled light and sedentary jobs that such an individual could perform (Tr. 433). He gave, as examples, sedentary jobs such as assembler (125,000 national jobs) and sealer operator (100,000 national jobs) (Tr. 433). At the light exertional level, jobs were available such as a vending machine attendant (90,000 national jobs) and cashier at a convenience

store (100,000 national jobs) (Tr. 433).

<u>Analysis</u>

The ALJ applied the five-step sequential evaluation and found Plaintiff was not disabled under Title II of the Social Security Act. In evaluating the Plaintiff's limitations, the ALJ did not give controlling weight to the opinion of one of Plaintiff's treating physicians, Dr. Johnson, who opined that Plaintiff was unable to reliably perform full-time work due to chronic respiratory disease (Tr. 154-57). Plaintiff argues, among other things, that the ALJ erred in not giving the opinion of Dr. Johnson controlling weight.

In his final decision, the ALJ fails to mention Dr. Johnson's opinion at all. The ALJ does incorporate his prior recitation of testimony and evidence from his first decision, which was favorable to Plaintiff, but specifically states his incorporation of such evidence from his first decision was "without necessarily adopting the inferences or conclusions it contains." (Tr. 21). In his first decision, the ALJ explained his findings concerning Dr. Johnson's opinion stating:

> In the present case, the functional impact of the claimant's obesity, in combination with her orthopedic injuries and breathing problems, renders her incapable of any sustained work activity. ...
>
> Dr. Johnson's pulmonary function studies reflect FEV1 and FVC values below 50 percent of predicted, representing significant restriction.

(Tr. 53-54) (internal citations to record omitted).

As reflected in the above quote, the ALJ only briefly mentioned Dr. Johnson's pulmonary studies in support of his first and favorable decision, which studies were incorporated to some unknown degree in his subsequent unfavorable decision (Tr. 54). In his final decision, the ALJ does mention Plaintiff's use of a breathing machine in an effort to combat "chronic obstructive pulmonary

15

disease", without any specific reference to Dr. Johnson (Tr. 21).

The Defendant does not dispute that Dr. Johnson was one of Plaintiff's treating physicians during the relevant time period. Although a treating physician's opinion typically is entitled to substantial deference, as argued by Plaintiff, the ALJ is not bound by that opinion. *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004); 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2). The Sixth Circuit has consistently stated that the treating physician's opinion is entitled to deference only if it is based on objective medical findings, *see, e.g., Warner*, 375 F.3d at 390; *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993), *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985), and not contradicted by substantial evidence to the contrary. *Hardaway v. Sec'y of Health & Human Servs.*, 823 F.2d 922, 927 (6th Cir. 1987). The Sixth Circuit also has held that the opinion of a treating physician generally is entitled to greater weight than the contrary opinion of a consulting physician who has examined the claimant on only a single occasion. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-30 (6th Cir. 1997); *Hardaway*, 823 F.2d at 927. The responsibility for weighing the record evidence, including conflicting physicians' opinions, and resolving the conflicts, rests with the ALJ. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). The ALJ may reject unsupported opinions or opinions inconsistent with other substantial evidence in the record. *Hall v. Bowen*, 837 F.2d 272, 276 (6th Cir. 1988); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). *See also* 20 C.F.R. §§ 404.1527(d) and 416.927(d).

The first issue to be considered by a reviewing court regarding the ALJ's application of the treating source regulation is whether there is substantial evidence to support the ALJ's decision to not give controlling weight to the opinion of the treating physician. *See* 20 C.F.R. §§ 404.1527(d) and 416.927(d). If the ALJ properly found the treating physician's opinion was not entitled to

16

controlling weight, the next consideration is whether he appropriately applied the following factors in determining how much weight to give the treating physician's opinion: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)). The next issue for consideration is whether the ALJ applied the correct legal standard in deciding how much weight to accord each doctor's opinion under the criteria set forth in 20 C.F.R. §§ 404.1527(d) and 426.927(d). Even where a reviewing court finds that substantial evidence supports the ALJ's decision not to give controlling weight to a treating physician's opinion, the agency regulations require the ALJ to give "good reasons" for that decision. 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2).

In *Wilson,* the Sixth Circuit discussed the treating source regulation with particular emphasis on the requirement that the agency "give good reasons" for not affording controlling weight to a treating physician's opinion in the context of a disability determination. 378 F.3d at 544-46 (citing and quoting 20 C.F.R. § 404.1527(d)(2)). Drawing a distinction between a regulation that bestows procedural benefits upon a party and one promulgated for the orderly transaction of the agency's business, the court found that the former confers a substantial, procedural right on the party invoking it, and concluded that the requirement in § 404.1527(d)(2) for articulation of good reasons for not giving controlling weight to a treating physician's opinion created a substantial right and important procedural safeguard for claimants. *Id.*

Defendant concedes that "the ALJ may have done a better job of articulating Dr. Johnson's records" but argues that the ALJ is not required to recite every piece of evidence in the file.

Defendant's Memorandum in Support of the Commissioner's Decision at 15 (Court File No. 17). Defendant argues that the ALJ accommodated Plaintiff's difficulty with breathing by restricting her from work that involved environmental irritants (Tr. 23-24). *Id*. at 14-15. Defendant also argues that Dr. Johnson's opinion is not entitled to controlling weight because it is merely a conclusory statement with no specific restrictions in that Dr. Johnson simply opined that Plaintiff could not work based on her chronic respiratory disease (Tr. 154-57), and that such a conclusory statement, even from a treating physician, is never entitled to controlling weight or special significance. *Id*. at 15. Defendant also argues that Dr. Johnson's opinion is not supported by the evidence, because during the same time frame that Dr. Johnson remarked that Plaintiff had "terrible lungs" (Tr. 150), testing was essentially normal (Tr. 176-79, 183, 181, 180). *Id*. Finally, while Defendant does not dispute that Plaintiff has a lung condition, Defendant does argue that the ALJ accommodates that condition based on Dr. Griffin's recommendation and the records of Dr. Cherry. *Id*. at 15-16.

Applying *Wilson*'s requirements for articulation to the ALJ's decision failing to assign controlling weight to Dr. Johnson's opinion, I find the ALJ's decision in this case falls far short of the requirements. First, the ALJ did not state that Dr. Johnson's opinion was not being given controlling weight or state the reason(s) for that finding in terms of the regulation, *i.e.,* the absence of support by medically acceptable clinical and laboratory techniques and/or inconsistency with other evidence in the case record. *Wilson,* 378 F.3d at 546. Second, the ALJ did not identify for the record evidence supporting any such finding. *Id.* Third, the ALJ did not articulate a determination of what weight, if any, to give the treating source's opinion in light of the factors listed in 20 C.F.R. § 404.1527(d)(2). *Id.* The ALJ need not always label the exact amount of weight given each opinion or list how he applied each of the factors in 20 C.F.R. § 1527(d) to explain his conclusion,

18

but his decision must show application of the regulatory framework and a thorough review of the evidence.

Although other physicians, including specialists, examined and even performed surgery on the Plaintiff in recent years, Dr. Johnson has continually treated the Plaintiff since April 2001 and has prescribed most of the her medications since that time (Tr. 132-57, 190-200, 372-79, 68-71, 78-81).[1] While the length and breadth of a doctor-patient relationship does not necessarily control the weight to be given to the treating physician's medical opinion, the agency's own regulations require the ALJ to apply those factors "in determining what weight to give the opinion." *Id*. at 544 (referring to 20 C.F.R. § 404.1527(d)(2)). In this case, while it is possible that the ALJ could support a decision to accord Dr. Johnson's opinion discounted weight for the reasons argued by Defendant, the ALJ did not provide any reasons for failing to give controlling weight to Dr. Johnson' opinion as required by the applicable regulation. *See Wilson*, 378 F.3d at 544 (citing 20 C.F.R. § 404.1527(d)(2)). A Social Security Ruling explains that, pursuant to this regulation, a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (1996). This reasoning seems especially applicable in a case such as this where there was a favorable (albeit not final) decision rendered by the same ALJ prior to the final unfavorable decision. As stated by the Sixth Circuit, "[t]he requirement of reason-giving exists, in part, to let claimants

---

[1] Treatment notes from Dr. Johnson cover the period from April 2001 through January 2004 (Tr. 132-57, 190-200, 372-79).

understand the disposition of their cases" and this is particularly true in situations where a claimant knows that his or her physician has deemed him or her to be disabled, and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Wilson,* 378 F.3d at 544 (citing *Snell v. Apfel,* 177 F.3d 128, 134 (2d Cir. 1999)). The requirement also ensures that the ALJ applies the treating physician regulation, and also permits meaningful review of the ALJ's application of the rule. *Id.* (citing *Halloran v. Barnhart,* 362 F.3d 28, 32-33 (2d Cir. 2004)). Simply stated, the ALJ's decision in this case does not adequately articulate his good reasons for discounting Dr. Johnson's opinion under the reasoning of *Wilson*.

Although it is not entirely clear, to the extent Defendant is arguing "harmless error" applies with respect to the ALJ's failure to articulate good reasons, that argument fails. A court may not be compelled to reverse the ALJ for failing to explain properly the weight given to a treating source, if the failure is harmless error. *Wilson,* 378 F.3d at 547 (noting in *dicta* a possibility that a finding of harmless error may be appropriate if there is a *de minimis* violation or "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion"). In this case, however, the ALJ apparently disagreed with Dr. Johnson's conclusions, and the ALJ's failure to give reasons for the amount of weight he placed on Dr. Johnson's opinion cannot be said to constitute harmless error under the circumstances. Because the ALJ did not give reasons for his treatment of Dr. Johnson's opinion, it would be improper for this reviewing Court to make its own determination regarding whether Dr. Johnson's opinion should be discounted and how much, if any, weight the opinion should be given. As held by the Sixth Circuit, a court cannot excuse the denial of a mandatory procedural protection simply because there is sufficient evidence in the record for

the ALJ to discount the treating source's opinion, and thus a different outcome on remand is unlikely. *Id.* at 546.

In light of the record evidence and the ALJ's failure to provide good reasons for his conclusion about Dr. Johnson's opinion, it is appropriate to remand this case to the Commissioner under sentence four of 42 U.S.C. § 405(g). Plaintiff raised additional issues in this appeal, but the Court need not review at this time the issues regarding the ALJ's credibility determinations, post-hearing vocational analysis, and medical expert issues raised by the parties.

<u>Conclusion</u>

Having carefully reviewed the administrative record and the briefs of the parties filed in support of their respective motions, for the reasons stated above it is **RECOMMENDED[2]**:

 (1) The Plaintiff's motion for judgment on the pleadings (Court File No. 13) be

   **GRANTED**;

 (2) The Defendant's motion for a summary judgment (Court File No. 16) be

   **DENIED**; and

---

 [2] Any objections to this Report and Recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7, 106 S. Ct. 466, 472 n.7, 88 L. Ed. 2d 435 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

(3)     A judgment be entered pursuant to Rule 58 of the Federal Rules of Civil

Procedure **REVERSING** and **REMANDING** the Commissioner's decision

which denied benefits to the Plaintiff, pursuant to Sentence Four of 42 U.S.C.

§ 405(g).


            s/*Susan K. Lee*                 
            SUSAN K. LEE
            UNITED STATES MAGISTRATE JUDGE